# United States Court of Appeals
## For the First Circuit

Nos. 15-2571; 16-1964

VICTOR GARCIA GARCIA,

Petitioner,

v.

JEFFERSON B. SESSIONS, III,
Attorney General of the United States,[*]

Respondent.

PETITIONS FOR REVIEW OF AN ORDER OF
THE BOARD OF IMMIGRATION APPEALS

Before

Barron, Selya, and Stahl,
Circuit Judges.

Nancy J. Kelly, with whom John Willshire Carrera, the Harvard Immigration & Refugee Clinic, and Greater Boston Legal Services were on brief, for petitioner.
Kevin J. Conway, Attorney, Office of Immigration and Litigation, Civil Division, United States Department of Justice, with whom Andrew Oliveira, Trial Attorney, Office of Immigration and Litigation, Benjamin C. Mizer, Principal Deputy Assistant Attorney General, and Justin Markel, Senior Litigation Counsel, were on brief, for respondent.

---

[*] Pursuant to Fed. R. App. P. 4(c)(2), Attorney General Jefferson B. Sessions, III has been substituted for former Attorney General Loretta E. Lynch as the respondent.

May 3, 2017

BARRON, **Circuit Judge**.  In this dispute, we must decide whether aliens who are subject to reinstated orders of removal may apply for asylum.  Below, the immigration judge ("IJ") and the Board of Immigration Appeals ("BIA") each concluded that such aliens may not apply for asylum, even though they may be entitled to withholding of removal.  The IJ and the BIA based their conclusions on certain provisions of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. 104-208, 110 Stat. 3009-546 ("IIRIRA"), as well as Department of Homeland Security ("DHS") regulations that implement those provisions.  And, on that basis, the IJ and the BIA ruled that Victor Garcia Garcia ("Garcia"), a citizen of Guatemala who is subject to a reinstated order of removal, could not apply for asylum, notwithstanding that the IJ determined (and the government does not dispute) that he is entitled to withholding of removal due to the persecution he would face in his home country.

Garcia now brings these consolidated petitions for review, in which he challenges the IJ's and the BIA's denial of his asylum application on the ground that a key provision of IIRIRA plainly entitles him to seek asylum.  He also contends that, in any event, the DHS regulations are unreasonable, insofar as they permit aliens subject to reinstated orders of removal to obtain withholding of removal but not to apply for asylum, because he contends that IIRIRA does not provide any basis for drawing such

a distinction between withholding of removal and asylum.  For the reasons that follow, we uphold the agency decisions below.

## I.

Immigration law is distinguished by its complexity more than by its clarity.  We thus need to provide some background before we turn to the merits of the legal issue that we must resolve.  To do so, we first describe the distinction between withholding of removal and asylum.  We then describe the relevant parts of IIRIRA -- some of which might appear on first glance to be in tension with one another -- and the implementing regulations.  Finally, we recount how Garcia came to be subject to the reinstated order of removal that the IJ and the BIA ruled stands in the way of his asylum request.

## A.

The distinction between withholding of removal and asylum is subtle but important.  We start by describing withholding of removal.

Congress codified the right to withholding of removal in 8 U.S.C. § 1231(b)(3)(A).  IIRIRA § 305; see also INS v. Aguirre-Aguirre, 526 U.S. 415, 420 (1999).  This statute directs, in categorical fashion, that, if the Attorney General decides that an alien's "life or freedom would be threatened" in the country to which he would be removed "because of the alien's race, religion, nationality, membership in a particular social group, or political

opinion," then "the Attorney General may not remove an alien to [that] country." 8 U.S.C. § 1231(b)(3)(A).[1]

The roots of this statutory provision may be traced to the 1951 United Nations Convention Relating to the Status of Refugees, 189 U.N.T.S. 150 (July 28, 1951) (the "Refugee Convention"). See INS v. Cardoza-Fonseca, 480 U.S. 421, 429 (1987). The United States acceded to the Refugee Convention by ratifying the 1967 Protocol Relating to the Status of Refugees, 19 U.S.T. 6223 (Nov. 6, 1968) (the "Refugee Protocol"). By doing so, the United States "agree[d] to comply with the substantive provisions of Articles 2 through 34" of the Refugee Convention. Cardoza-Fonseca, 480 U.S. at 429. Article 33.1 of the Refugee Convention provides: "No Contracting State shall expel or return ('refouler') a refugee in any manner whatsoever to the frontiers of territories where his life or freedom would be threatened on account of his race, religion, nationality, membership of a particular social group or political opinion." 19 U.S.T at 6276.[2]

---

[1] 8 U.S.C. § 1231(b)(3)(B) then describes certain specific categories of aliens -- not including those subject to reinstated removal orders -- who may not benefit from withholding of removal. See 8 U.S.C. § 1231(b)(3)(B).

[2] A refugee is defined in Article 1(2) of the Refugee Convention as someone who, "owing to well-founded fear of being persecuted for reasons of race, religion, nationality, membership of a particular social group or political opinion, is outside the country of his nationality and is unable or, owing to such fear, is unwilling to avail himself of the protection of that country." 19 U.S.T. at 6226.

Thus, 8 U.S.C. § 1231(b)(3)(A) implements this "mandatory duty" of the United States as a "contracting State[]" to the Refugee Protocol.  Cardoza-Fonseca, 480 U.S. at 429.

We now turn to asylum.  Congress codified the right to apply for asylum in 8 U.S.C. § 1158(a)(1), which provides: "Any alien who is physically present in the United States or who arrives in the United States . . . irrespective of such alien's status, may apply for asylum in accordance with this section . . . ." IIRIRA § 604; see also Aguirre-Aguirre, 526 U.S. at 420.  Thus, 8 U.S.C. § 1158 lays out a "discretionary mechanism which gives the Attorney General the authority to grant the broader relief of asylum to refugees,"  Cardoza-Fonseca, 480 U.S. at 441 (emphasis in original) -- that is, pursuant to 8 U.S.C. § 1101(a)(42)(A), aliens who can show a "well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion."  See also 8 C.F.R. §§ 208.13(b), 1208.13(b).

The roots of this statutory grant of the right to apply for asylum may also be traced to the Refugee Protocol, in which the United States acceded to the Refugee Convention.  In particular, Article 34 of the Convention provides: "The Contracting States shall as far as possible facilitate the assimilation and naturalization of refugees."  19 U.S.T. at 6276. And, as the Supreme Court has explained, Congress's statutory

mechanism for applying for asylum implements Article 34's "precatory" language. Cardoza-Fonseca, 480 U.S. at 441.

The upshot of the domestic statutory provisions that implement these two articles of the Refugee Convention is this: aliens who can show a "clear probability" of persecution -- that is, that "it is more likely than not that the alien would be subject to persecution," INS v. Stevic, 467 U.S. 407, 424 (1984) -- are "entitled to mandatory suspension of deportation," or, as it is now known, withholding of removal, Cardoza-Fonseca, 480 U.S. at 444 (emphasis in original). 8 U.S.C. § 1231(b)(3)(A). In contrast, aliens "who can . . . show [only] a well-founded fear of persecution" -- that is, refugees per the definition laid out in 8 U.S.C. § 1101(a)(42)(A) -- "are not entitled to anything." Cardoza-Fonseca, 480 U.S. at 444 (emphasis in original). Instead, pursuant to 8 U.S.C. § 1158, such aliens merely "are eligible for the discretionary relief of asylum." Id. (emphasis in original); see also Aguirre-Aguirre, 526 U.S. at 420 ("[W]hereas withholding is mandatory unless the Attorney General determines one of the exceptions applies, the decision whether asylum should be granted to an eligible alien is committed to the Attorney General's discretion.").

In Cardoza-Fonseca, the Court made clear that -- given the differences between withholding of removal and asylum -- the standards governing the two were necessarily different. 480 U.S.

at 449-50. Specifically, the clear-probability test for triggering the United States' mandatory duty to withhold removal is more demanding than the "well-founded fear" test that must be satisfied to trigger the Attorney General's exercise of his discretion as to whether to grant asylum. Id.

Withholding of removal and asylum also differ in another key respect: they afford aliens distinct types of benefits. In particular, asylum, though obtainable upon a less-demanding showing, "affords broader benefits" to the recipient than does withholding of removal. Cardoza-Fonseca, 480 U.S. at 428 n.6. As the Ninth Circuit summarizes:

> Unlike an application for asylum . . . a grant of an alien's application for withholding is not a basis for adjustment to legal permanent resident status, family members are not granted derivative status, and [the relief] only prohibits removal of the petitioner to the country of risk, but does not prohibit removal to a non-risk country.

Lanza v. Ashcroft, 389 F.3d 917, 933 (9th Cir. 2004) (quoting Castellano-Chacon v. INS, 341 F.3d 533, 545 (6th Cir. 2003) (second alteration in the original)). In addition, aliens granted asylum may be issued a refugee travel document, enabling them to travel outside of the United States and subsequently return. By contrast, aliens who are merely entitled to withholding of removal receive no such benefit. 8 C.F.R. §§ 223.1, 223.2. They are simply protected from being sent back to their home country. Thus, an alien who is entitled to withholding of removal may still have an

interest in seeking asylum, given the greater benefits it affords an alien.  See 8 U.S.C. § 1158(c)(1).[3]

Having described the distinction between withholding of removal and asylum, and the statutes that enable aliens to obtain each, we need to discuss one final statutory provision that is of direct relevance to the issue we confront here.  8 U.S.C. § 1231(a)(5) -- part of section 305 of IIRIRA -- states that an alien subject to a reinstated order of removal "is not eligible and may not apply for any relief under . . . [chapter 12 of Title 8 of the U.S. Code], and the alien shall be removed under the prior order at any time after the entry."  8 U.S.C. § 1231(a)(5).  This provision matters here because, as the parties to this dispute agree, asylum is a form of "relief" under chapter 12.

Thus, the question arises as to how this seemingly sweeping statutory bar to relief relates both to the seemingly categorical grant of the right to seek asylum provided to aliens in § 1158(a)(1) and to the directive to the Attorney General to withhold removal in certain enumerated circumstances that is set forth in § 1231(b)(3)(A).  After all, that latter provision also appears in chapter 12.

---

[3] Aliens whose removal has been withheld are, however, like aliens granted asylum, authorized to accept employment in the United States.  8 C.F.R. § 274a.12(a)(5), (10).

DHS, which is now charged with administering IIRIRA, has offered its answer to that question. It has done so in regulations that attempt to harmonize the three statutory provisions -- 8 U.S.C. §§ 1258(a)(1), 1231(a)(5) and 1231(b)(3)(A) -- along with the United States' obligations under the Convention Against Torture ("CAT"). See United Nations Convention Against Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment, S. Treaty Doc. No. 100-20 (1988), 1465 U.N.T.S. 95 (entered into force June 26, 1987); Regulations Concerning the Convention Against Torture, 64 Fed. Reg. 8478 (Feb. 19, 1999); see also Aliens and Nationality; Homeland Security; Reorganization of Regulations, 68 Fed. Reg. 9824 (Feb. 28, 2003) (transferring the functions of the Immigration and Naturalization Service to the Department of Homeland Security and recodifying the regulations).[4]

The regulations do so as follows. First, 8 C.F.R. § 241.8(a) requires that an alien "who illegally reenters the United States after having been removed . . . shall be removed from the United States by reinstating the prior order." That subsection further provides that such an alien "has no right to a hearing before an immigration judge in such circumstances." Id.; see also 8 C.F.R. § 1241.8(a).

---

[4] Despite the transfer to DHS, the statutory responsibilities assigned to the Attorney General that are "indigenous to the functions of the Attorney General" were retained in the Department of Justice. 68 Fed. Reg. at 9824.

Subsection (e) of that regulation, however, then creates an "[e]xception."  It provides that an alien who "expresses a fear of returning to the country designated in" his reinstated removal order "shall be immediately referred to an asylum officer for an interview to determine whether the alien has a reasonable fear of persecution or torture pursuant to § 208.31 of this chapter." 8 C.F.R. § 241.8(e); see also 8 C.F.R. § 1241.8(e).  The regulation referenced at the end of this exception, 8 C.F.R. § 208.31(e), in turn provides that:

> If an asylum officer determines that an alien described in this section has a reasonable fear of persecution or torture, the officer shall so inform the alien and issue a Form I–863, Notice of Referral to the Immigration Judge, for full consideration of the request for withholding of removal only.

(emphasis added); see also 8 C.F.R. § 1208.31(e).[5]

Thus, under the regulations, an alien subject to a reinstated order of removal may not apply for asylum.  However, after such an alien has expressed a fear of persecution and after an asylum officer has determined that fear to be reasonable, the alien is entitled to withholding of removal to his home country if the Attorney General then decides that the alien's life or freedom

---

[5] 8 C.F.R. § 208.16 governs the agency's consideration of the alien's application for withholding of removal, whether made under 8 U.S.C. § 1231(b)(3)(A) or under the CAT.  See 8 C.F.R. § 208.16(b), (c); § 1208.16(b), (c).

would be threatened in his home country because of a protected ground.

## B.

With that legal background in place, we now turn to Garcia's current plight. Garcia -- who speaks no English and only minimal Spanish -- first entered the United States unlawfully in 2004. Three years later, in 2007, immigration authorities in the United States apprehended Garcia, detained him, and then ordered him removed from this country. From all that the record reveals, it appears that Garcia would have been successful in obtaining asylum had he sought it at that time. And, it appears, too, he may have been entitled to withholding of removal. But, he did not request either asylum or withholding of removal, apparently because of the language barriers he faced and because he was uncounseled. Accordingly, Garcia was removed to Guatemala in 2007.

After returning to Guatemala, Garcia then entered the United States unlawfully for a second time in February 2015. Once Garcia had crossed the border into the United States, immigration authorities detained him. Released on his own recognizance, Garcia was permitted to travel to Massachusetts to stay with family members. Garcia was informed about two months later that his 2007 removal order would be reinstated. As the IJ noted, after retaining counsel, Garcia "expressed a fear of return to Guatemala on account of his ethnicity, family membership, and religious

beliefs," and was referred to an asylum officer pursuant to 8 C.F.R. §§ 241.8(e) and 1241.8(e).  See also 8 C.F.R. §§ 208.16, 1208.16 (laying out procedures for consideration of withholding of removal under 8 U.S.C. § 1231(b)(3)(A) and under the CAT).  The asylum officer conducted the required interview and concluded that Garcia had met his burden of showing a "reasonable fear of persecution."  8 C.F.R. §§ 241.8(e), 1241.8(e).

Thereafter, Garcia's case was referred to an IJ.  In an oral decision issued on August 4, 2015, the IJ first concluded that Garcia, whom the IJ found "credible," had met his burden, pursuant to 8 U.S.C. § 1231(b)(3)(A), of showing that "future persecution is 'more likely than not' to occur" in Guatemala and therefore granted Garcia's application for withholding of removal. Specifically, the IJ found that Garcia had experienced past persecution "on account of [his] family membership as well as his ethnicity inasmuch as [] Ladino [that is, mixed-race] soldiers," as well as government-affiliated paramilitary forces and gangs, "had targeted his village, which was comprised almost exclusively of Mayan indigenous individuals, for retaliation for the belief that these individuals were aiding or assisting in any way the guerilla movement during the civil war."  And, the IJ found, "based upon the evidence . . . that the predominant Ladino element will not assist the Mayan community in fighting off the Ladino outlaw

- 13 -

elements," and thus that Garcia had shown "a reasonable likelihood of persecution or harm in the future by these same elements."

But, in addition to seeking withholding of removal, Garcia had also argued to the IJ that he was eligible to apply for asylum and thus to receive the additional benefits that such relief would afford him. Garcia based this argument on the text of 8 U.S.C. § 1158(a)(1), which, he argued, entitled even an alien subject to a reinstated removal order to seek asylum.

In his oral decision, the IJ rejected Garcia's argument that he was eligible to seek asylum. The IJ held that asylum is a form of "relief" provided by chapter 12 of Title 8 of the U.S. Code and thus that 8 U.S.C. § 1231(a)(5) barred Garcia from applying for it. The IJ also held that the DHS implementing regulations supported this conclusion. Thus, the IJ concluded that, by virtue of Garcia's reinstated removal order, and notwithstanding § 1158(a)(1), Garcia was barred from seeking asylum, regardless of whether he was entitled to withholding of removal.

Garcia then appealed the IJ's oral ruling to the BIA. On December 1, 2015, the BIA affirmed the IJ's decision in all respects and remanded the case so that the IJ could conduct certain background checks before ordering the withholding of Garcia's removal. While awaiting the results of the background checks,

Garcia petitioned for review in this court of the BIA's decision denying his request to apply for asylum.

On July 6, 2016, while Garcia's petition was pending in this court, the background checks were completed. At that point, the IJ granted Garcia withholding of removal. In doing so, the IJ also stated that the IJ's August 4, 2015 oral decision, which had also denied Garcia's request to seek asylum, would become the "official opinion in this case."

Following the IJ's July 6, 2016 order, Garcia petitioned this court for review. Garcia also moved to consolidate that newly filed petition for review with his pending petition for review of the BIA's December 2015 ruling that also barred him from seeking asylum. On August 18, 2016, we granted Garcia's unopposed motion to consolidate his two petitions for review.

At oral argument before this court concerning these consolidated petitions, the government agreed with Garcia that the IJ's July 2016 order, which had been issued after the completion of the background checks, and which granted Garcia withholding of removal but barred him from applying for asylum, constituted a final order over which we have jurisdiction. We also agree with Garcia on that point, and so, our jurisdiction secure, see Cano-

Saldarriaga v. Holder, 729 F.3d 25, 27 (1st Cir. 2013), we proceed to the merits.[6]

## II.

Garcia's right to apply for asylum under § 1158(a)(1) turns on "questions implicating 'an agency's construction of the statute which it administers.'" Vásquez v. Holder, 635 F.3d 563, 567 (1st Cir. 2011) (quoting Aguirre-Aguirre, 526 U.S. at 424). We thus "apply the principles of deference described in Chevron USA Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 842 (1984)." Id. (quoting Aguirre-Aguirre, 526 U.S. at 424) (brackets omitted).

"We first ask whether 'Congress has directly spoken to the precise question at issue.'" Succar v. Ashcroft, 394 F.3d 8, 22 (1st Cir. 2005) (quoting Chevron, 467 U.S. at 842). "If so,

---

[6] The dissent spends a great deal of time developing arguments about a potential due process violation concerning Garcia's initial removal and its bearing on the propriety of his reinstated order of removal. But Garcia is arguing to us only that aliens who are subject to reinstated orders of removal may seek asylum, even though they may be barred from seeking other forms of relief. Thus, the dissent's extended discussion of case law concerning whether flaws in an underlying removal order may provide a basis for challenging a reinstated order of removal has no bearing on this appeal. That is no doubt why the due process issue on which the dissent focuses is not only not "front and center" in Garcia's briefing, post at 53, but also not set forth as a developed argument at all about the only statutory issue that Garcia raises -- namely, how to construe § 1231(a)(5) in light of § 1158(a)(1).

courts, as well as the agency, 'must give effect to the unambiguously expressed intent of Congress.'" Id. (quoting Chevron, 467 U.S. at 842–43). But if we "determine[] Congress has not directly addressed the precise question at issue," then we must move on to the second step of the analysis. Chevron, 467 at 843. At this second step, "[we] do[] not simply impose [our] own construction on the statute, as would be necessary in the absence of an administrative interpretation." Id. Rather, "if the implementing agency's construction is reasonable, Chevron requires a federal court to accept the agency's construction of the statute." Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs., 545 U.S. 967, 980 (2005); see also Succar, 394 F.3d at 23 ("If the statutory terms are ambiguous, then the principle of Chevron deference to the Attorney General's choice must apply.")

**A.**

Garcia contends that § 1158(a)(1) unambiguously grants him the right to seek asylum. He thus argues that he wins at Chevron's first step.

In pressing this argument, Garcia acknowledges that there is another provision of IIRIRA that could be read to take away what § 1158(a)(1) otherwise appears to give: § 1231(a)(5). That provision expressly bars aliens subject to reinstated orders of removal from seeking "any relief" available under chapter 12 of Title 8 of the U.S. Code, and Garcia does not dispute that asylum

- 17 -

is a type of relief that is available under that chapter. 8 U.S.C. § 1231(a)(5). Nevertheless, Garcia argues that § 1158(a)(1) unambiguously creates an exception to the bar that § 1231(a)(5) otherwise appears to impose.[7]

In making this argument, Garcia cannot -- and does not -- contend that § 1158(a)(1) actually repealed the bar that § 1231(a)(5) appears to establish. Both provisions were enacted on the same day as part of the same statute: IIRIRA. Garcia instead argues that, in enacting IIRIRA, Congress changed what had been the relevant text of § 1158(a)(1). And Garcia argues that Congress did so in a manner that clearly reflected an intention to carve out an exception to § 1231(a)(5) for aliens seeking asylum.

Garcia points out that, pre-IIRIRA, § 1158(a)(1) referred only to "an" alien being entitled to seek asylum "irrespective of [the alien's] status." Refugee Act of 1980, Pub. L. 96-212, § 208, 94 Stat. 102, 105 (emphasis added). But, Garcia notes, IIRIRA changed the wording of the text. Section 1158(a)(1)

_____

[7] Garcia's argument regarding § 1158(a)(1), if accepted, would not render § 1231(a)(5) a nullity. Chapter 12 provides for other forms of relief, besides asylum: cancellation of removal, pursuant to 8 U.S.C. § 1229b; voluntary departure as an alternative to removal, pursuant to 8 U.S.C. § 1229c; and adjustment of status, pursuant to 8 U.S.C. § 1255. See, e.g., Fernandez-Vargas v. Gonzales, 548 U.S. 30, 42 n.9, 44 n.10 (2006) (characterizing these procedural avenues as forms of "relief"); Rodriguez v. Gonzales, 451 F.3d 60, 61 (2d Cir. 2006) (characterizing cancellation of removal and adjustment of status as "relief"); see also Zambrano-Reyes v. Holder, 725 F.3d 744, 752 (7th Cir. 2013) (characterizing a motion to reopen removal proceedings as a form of "relief").

now refers to "any alien," while keeping the sweeping phrase "irrespective of [the alien's] status." IIRIRA § 604 (emphasis added). Garcia contends that this change from "an" to "any" clearly shows that Congress intended the broad grant of the right to seek asylum set forth in § 1158(a)(1) to take precedence over § 1231(a)(5)'s seemingly contradictory bar.[8]

We do not agree. As a matter of grammar, the word "any" is not clearly more sweeping than is the word "an." Thus, the change in wording need not be understood to reflect Congress's intention that § 1158(a)(1) trumps the bar that § 1231(a)(5) otherwise imposes. We are also reluctant to conclude that, insofar as "any" might be thought to be somewhat more sweeping than "an," Congress used the subtle stratagem of replacing one indefinite article with a different one to signal its unambiguous intent to make an exception to an otherwise categorical bar that Congress set forth the very same day in a different provision of the very

---

[8] Adding force to Garcia's argument, these other forms of relief are styled as grants of discretion to the Attorney General to provide relief, rather than as a categorical grant of an entitlement to any alien to seek it, as § 1158(a)(1) is styled. Section 1229b(a), for instance, provides: "The Attorney General _may_ cancel removal" under certain circumstances. (emphasis added). Likewise, § 1229c provides: "The Attorney General _may_ permit an alien voluntarily to depart the United States at the alien's own expense . . . ." (emphasis added). Finally, § 1255 provides: "The status of an alien who was inspected and admitted or paroled into the United States . . . _may_ be adjusted by the Attorney General, in his discretion and under such regulations as he may prescribe, to that of an alien lawfully admitted for permanent residence . . . ." (emphasis added).

same statute. See Barraford v. T & N Ltd., 778 F.3d 258, 266 (1st Cir. 2015) ("It has been said of statutes that one does not normally hide elephants in mouseholes." (citing Whitman v. Am. Trucking Ass'ns, Inc., 531 U.S. 457, 468 (2001))).

In addition, Garcia's reading of § 1158(a)(1) is not necessary to ensure that one of its words -- "any" -- means what it says. Even on Garcia's favored reading, the word "any" in § 1158(a)(1) would not mean literally "any." Section 1158(a)(2) itself makes clear that certain types of aliens are not eligible to apply for asylum, even though § 1158(a)(1) states that "any" alien may do so. See 8 U.S.C. § 1158(a)(2).[9]

Garcia does argue that § 1158(a)(1) should be read to override all exceptions to its grant of the right to seek asylum except for the ones that are expressly set forth in § 1158 itself. But, even if Garcia's suggested reading is a possible one, we do not see why it is compelled. As the Fifth Circuit observed in considering and rejecting this very same argument, Congress has "many options in revising statutory schemes," and "[a]dopting a clear limitation in one section [i.e., § 1231(a)(5)] without amending another section specifically dealing with the same

---

[9] Garcia does not argue that the phrase "irrespective of such alien's status" -- which, unlike the change from "an" to "any," dates back to section 208 of the Refugee Act, Cardoza-Fonseca, 480 U.S. at 427, and thus pre-dates IIRIRA -- in and of itself trumps § 1231(a)(5).

- 20 -

subject [i.e., § 1158] is one such option." Ramirez-Mejia v. Lynch, 794 F.3d 485, 490 (5th Cir. 2015), reh'g en banc denied, 813 F.3d 240 (5th Cir. 2016); see also Perez-Guzman v. Lynch, 835 F.3d 1066, 1076 (9th Cir. 2016), reh'g and reh'g en banc denied (No. 13-70579, Apr. 26, 2017) ("In adopting both changes simultaneously, Congress effectively adopted 'a clear limitation in one section' -- § 1231(a)(5) -- 'without amending another section' dealing with the same subject matter." (quoting Ramirez-Mejia, 794 F.3d at 490)).

Moreover, reading § 1231(a)(5) to set forth an additional "statutory limit," Ramirez-Mejia, 794 F.3d at 490, does not render superfluous § 1158(a)(2), which conditions asylum eligibility on compliance with certain requirements, see 8 U.S.C. § 1158(a)(2). In addition, the limits on asylum eligibility that § 1158(a)(2) expressly sets forth do not render § 1231(a)(5) redundant if it, too, limits an alien's right to seek asylum. Those express limits in § 1158(a)(2) do not concern the eligibility to seek relief of aliens subject to reinstated removal orders, while § 1231(a)(5) does.

Shifting course, Garcia contends that § 1158(a)(1) must be read unambiguously to trump § 1231(a)(5), because the former provision is the more specific provision of the two. But, as the Ninth Circuit has noted, the "difficulty" is that both § 1158(a)(1) and § 1231(a)(5) are "specific in certain respects and general in

others." Perez-Guzman, 835 F.3d at 1075. It is thus just as possible, as a matter of text alone, to say that § 1231(a)(5) imposes a specific check on § 1158(a)(1)'s general grant of eligibility to apply for asylum as it is to say that § 1158(a)(1) carves out a specific exception to the general bar to relief that applies to aliens subject to reinstated removal orders. See id. at 1075-76 (noting that § 1158(a)(1) is "more specific in that it speaks narrowly to the rules governing asylum applications," while § 1231(a)(5) "is more specific in that it speaks directly to the particular subset of individuals . . . who are subject to reinstated removal orders").

Garcia's final textual argument relies on § 1158(a)(2)(D). That provision permits individuals who have been previously denied asylum to file a second asylum application if they can demonstrate "either the existence of changed circumstances which materially affect . . . eligibility for asylum or extraordinary circumstances relating to the delay in filing an application." 8 U.S.C. § 1158(a)(2)(D). Garcia argues that reading § 1231(a)(5) to bar aliens subject to reinstated removal orders from applying for asylum would nullify § 1158(a)(2)(D).

But Garcia is mistaken on this point. Many aliens who are not subject to reinstated orders of removal may benefit from § 1158(a)(2)(D). As a result, § 1231(a)(5), insofar as it limits § 1158(a)(2)(D), does not thereby render that provision a nullity.

See Perez-Guzman, 835 F.3d at 1082 (noting that it is not "necessarily" the case that "any individual to whom § 1158(a)(2)(D) applies will . . . be subject to a reinstated removal order").

In light of this complex statutory scheme, we cannot say that § 1158(a)(1) unambiguously grants Garcia the right to seek asylum, and we reject his contention that he wins at Chevron's first step.

## B.

Because the relevant statutory provisions do not clearly compel Garcia's reading, we ordinarily would move on from Chevron's first step to see whether Garcia could win at step two of the Chevron analysis. The government argues, however, that we may not do so because the relevant provisions in IIRIRA, properly read, clearly bar aliens subject to reinstated orders of removal from seeking asylum. The government thus argues not only that Garcia loses at step one of Chevron but also that the government prevails at that same step.

In so arguing, the government contends that "asylum" is plainly a form of "relief" to which § 1231(a)(5)'s bar applies. The government further contends there is no conflict between §§ 1231(a)(5) and 1158(a)(1), because the former is more specific than the latter and thus the former must take precedence. And, finally, the government argues that its reading of "relief" to encompass asylum comports with its conclusion that § 1231(a)(5)

does not bar aliens subject to reinstated orders of removal from having their removal withheld pursuant to § 1231(b)(3)(A). And that is because, the government contends, withholding of removal differs from asylum because withholding of removal provides "protection" rather than "relief." Accordingly, the government contends that the statutes clearly compel the interpretation reflected in the regulations, in which aliens subject to reinstated orders of removal may not apply for asylum but may be entitled to withholding of removal.

A number of circuits have agreed with the government. They have held that § 1231(a)(5) does clearly bar aliens subject to reinstated orders of removal from seeking asylum, notwithstanding § 1158(a)(1). See Jimenez-Morales v. U.S. Att'y Gen., 821 F.3d 1307, 1310 (11th Cir. 2016); Ramirez-Mejia, 794 F.3d at 489-90. But, there is at the least a surface tension between the two provisions -- with § 1231(a)(5) seemingly barring aliens subject to reinstated orders of removal from seeking asylum and § 1158(a)(1) seemingly conferring upon any alien (save for those expressly mentioned in that provision) the right to seek asylum. And, as the Ninth Circuit has noted, insofar as these provisions conflict with one another, it is by no means clear which is the more specific of the two. See Perez-Guzman, 835 F.3d at 1075-76.

Thus, rather than deciding the case for the government at step one of Chevron -- an issue on which we take no view -- we proceed to Chevron's second step.[10]  At step two, we must accept the agency's regulatory choice as to how to resolve an ambiguity in a statute that the agency administers -- such as the putative ambiguity presented by the tension we have identified -- if the choice it makes is a reasonable one.  See Nat'l Ass'n of Home Builders v. Defs. of Wildlife, 551 U.S. 644, 661, 666-67 (2007) (applying Chevron deference to "mediate a clash of seemingly categorical -- and, at first glance, irreconcilable -- legislative commands").  And we conclude that the agency's choice in this case is one that we must accept, because the agency's regulations reasonably balance the various statutory provisions by "establish[ing] a new screening process to rapidly identify and assess both claims for withholding of removal under [§ 1231(b)(3)] and for protection under the [CAT] . . . without unduly disrupting

---

[10] Garcia contends that, in this case, the agency cannot benefit from deference at Chevron's second step because the agency did not interpret the statutory scheme, but instead "believe[d] that [its] interpretation is compelled by Congress."  Garcia offers no support for this proposition, and we find none in the agency's own statements.  See Perez-Guzman, 835 F.3d at 1079 n.8 ("The administrative history does not . . . suggest the agency saw § 1231(a)(5) as compelling the regulation's particular approach to asylum, withholding of removal or CAT protection.  On the contrary, the agency's explanation shows it applied its expertise by crafting an expedited screening process and balancing the fair resolution of claims for relief from removal against Congress' desire to provide for streamlined removal of certain classes of individuals, including those subject to reinstated removal orders.").

the streamlined removal processes applicable to" aliens subject to reinstated removal orders.  <u>Regulations Concerning the Convention Against Torture</u>, 64 Fed. Reg. at 8479.

In reaching this conclusion, we recognize, as Garcia correctly points out, that courts, the BIA, and DHS have at times used the word "relief" -- which is the key word in § 1231(a)(5) -- to refer to both asylum and withholding of removal.[11]  We thus understand the basis for Garcia's contention that the agency's regulatory choice is arbitrary because it permits aliens to obtain one type of "relief" under chapter 12 -- withholding of removal -- but not another -- asylum -- even though the relevant statutory provision, § 1231(a)(5), bars aliens subject to reinstated orders of removal from seeking the "relief" chapter 12 affords. Garcia therefore argues that the only coherent interpretation is one in which the agency affords withholding of removal the same treatment as asylum.  And since the agency permits aliens subject to reinstated orders of removal to be eligible for

---

[11]  <u>See, e.g.</u>, <u>Aguirre-Aguirre</u>, 526 U.S. at 419 ("Under the immigration laws, withholding is distinct from asylum, although the two forms of relief serve similar purposes."); <u>Hinds</u> v. <u>Lynch</u>, 790 F.3d 259, 261 (1st Cir. 2015) (commenting that the petitioner sought no "asylum, withholding, or other relief from the Immigration Judge"); <u>López-Castro</u> v. <u>Holder</u>, 577 F.3d 49, 52 (1st Cir. 2009) ("This brings us to the particular relief sought in the instant case: withholding of removal."); <u>Matter of L-A-C-</u>, 26 I. & N. Dec. 516, 519 (BIA 2015) ("[A]n applicant who seeks asylum or withholding of removal has the burden of demonstrating eligibility for such relief . . . .").

the former, Garcia contends that such aliens must be permitted to apply for latter, too.

The problem with Garcia's argument is that the relevant question at Chevron's second step is not whether it is possible to characterize both asylum and withholding of removal as forms of "relief," such that each then would be subject to § 1231(a)(5)'s statutory bar or neither would be. The relevant question instead is whether it is unreasonable to distinguish between asylum and withholding of removal for purposes of applying that bar. And, in our view, it is not. See Perez-Guzman, 835 F.3d at 1081 (holding that "it is not unreasonable to conclude Congress intended to bar . . . persons in reinstated removal proceedings [from applying for asylum] while preserving relief [that is, withholding of removal] for individuals able to meet the higher standards for withholding of removal and CAT relief").

For one thing, the distinction that the government posits in defending the regulations, such that asylum is a form of "relief" that § 1231(a)(5) bars while withholding of removal is a form of "protection" that § 1231(a)(5) does not by its terms reach, reasonably tracks the distinct ways in which the Supreme Court has described asylum and withholding of removal in construing the United States' obligations under the Refugee Protocol. As we noted at the outset, the Court has explained that, under the Refugee Protocol, "those who can show a clear probability of persecution

- 27 -

are _entitled_ to mandatory suspension of deportation . . . while those who can only show a well-founded fear of persecution are not _entitled_ to anything, but are _eligible_ for the discretionary relief of asylum."  Cardoza-Fonseca, 480 U.S. at 444 (emphases in original).  Thus, withholding of removal has long been understood to be a mandatory protection that must be given to certain qualifying aliens, while asylum has never been so understood.

The text of the relevant provisions of IIRIRA provides further support for distinguishing between asylum and withholding of removal in construing the scope of the bar that § 1231(a)(5) imposes.  For example, § 1231(b)(3)(A), unlike § 1158(a)(1), does not by its terms expressly purport to permit an alien to do what § 1231(a)(5) appears expressly to forbid: "apply for . . . relief" under chapter 12.  Rather, § 1231(b)(3)(A) is styled as a limitation on the Attorney General's removal authority.  That provision, unlike § 1158, thus appears simply to guarantee that an alien facing persecution or torture will receive protection from being returned to the alien's home country.[12]

---

[12]  In this respect, moreover, § 1231(b)(3)(A) differs significantly from each of the grants of relief other than asylum that Congress provided for in chapter 12.  While Section 1231(b)(3)(A) _prohibits_ the Attorney General from removing an alien if that alien satisfies the statutory criteria, as we noted above, §§ 1229b, 1229c, and 1255 _permit_ the Attorney General to undertake certain actions as a matter of discretion.

The agency's choice to treat asylum, but not withholding of removal, as subject to the bar to applying for "relief" set forth in § 1231(a)(5) also comports with the relevant legislative history, even if it is not compelled by it. By reading "relief" to encompass asylum, the agency's regulations give effect to Congress's clear intention, in enacting § 1231(a)(5), to "strengthen the reinstatement provision and to make it operate more efficiently." Lattab v. Ashcroft, 384 F.3d 8, 19 (1st Cir. 2004). IIRIRA did so by "enlarg[ing] the class of illegal reentrants whose orders may be reinstated and limit[ing] the possible relief from a removal order available to them." Fernandez-Vargas v. Gonzales, 548 U.S. 30, 33 (2006). But, the legislative history does not show that Congress intended for § 1231(a)(5) to be an all-encompassing bar on the ability of aliens subject to reinstated removal orders to remain in the United States. See S. Rep. 104-249, at 7 (1996) (emphasizing that, although "[a]liens who violate U.S. immigration law should be removed from this country as soon as possible," that broad aim was subject to "[e]xceptions . . . specified in the statute and approved by the Attorney General"); H.R. Rep. 104-469, pt. 1, at 107-08 (1996) (noting that although "[r]emoval of aliens who enter the United States illegally . . . is an all-too-rare event," and therefore that "[r]elief from deportation will be more strictly limited," aliens subject to the new "streamlined appeal and removal

process" now laid out in § 1231(a)(5) could nevertheless "establish . . . that they are entitled to be admitted or to remain in the United States").  Thus, we cannot say that the agency acted unreasonably in choosing to ensure that the same aliens who could not seek asylum still would be protected through withholding of removal from suffering persecution or torture in their home country, in accord with § 1231(b)(3)(A)'s clear directive to the Attorney General to afford that vital and long-understood-to-be mandatory protection.

## III.

Garcia makes two additional arguments as to why he should win, each of which relies on a longstanding canon of construction. But, in our view, neither argument is persuasive.

First, Garcia argues that the rule of lenity that has been applied in the immigration context requires us to resolve any statutory ambiguity in his favor, notwithstanding that the agency's choice might otherwise be considered to be a reasonable one.  It is not at all clear, however, that the rule of lenity, which "favors construction of immigration laws in the light most favorable to the alien" only insofar as that alien risks the "drastic consequences of deportation," Lumataw v. Holder, 582 F.3d 78, 90 (1st Cir. 2009), bears on the precise interpretive question that we face.  After all, that question concerns the type of "relief" that an alien whose removal has been withheld may obtain.

- 30 -

See also Cardoza-Fonseca, 480 U.S. at 449 (identifying a "longstanding principle of construing any lingering ambiguities in deportation statutes in favor of the alien"); INS v. St. Cyr, 533 U.S. 289, 320 (2001) (same) (quoting Cardoza-Fonseca, 480 U.S. at 421); Fong Haw Tan v. Phelan, 333 U.S. 6, 10 (1948) (applying the rule of lenity "because deportation is a drastic measure and at times the equivalent of banishment o[r] exile").

But, even if the rule of lenity might be relevant to this case, we have stated that it "cannot apply to contravene the BIA's reasonable interpretation" of an immigration statute where the agency makes use of "ordinary principles of statutory interpretation." Soto-Hernandez v. Holder, 729 F.3d 1, 6 (1st Cir. 2013). And Garcia does not explain why, notwithstanding our ruling in Soto-Hernandez and the seeming reasonableness of the agency's choice under traditional tools of statutory construction, the rule of lenity should control here.

Second, Garcia argues that, for over two hundred years, it has been a canon of statutory construction -- known as the Charming Betsy canon -- that a statute "ought never to be construed to violate the law of nations if any other possible construction remains." Murray v. Schooner Charming Betsy, 6 U.S. (2 Cranch) 64, 118 (1804). Yet, Garcia contends, the agency's interpretation of the statutory scheme -- by denying aliens subject to reinstated orders of removal the right to seek asylum -- would violate certain

- 31 -

of the United States' obligations under the Refugee Convention, to which the United States acceded via the Refugee Protocol.

In particular, Garcia contends that the agency's reading conflicts with Article 34 and Article 28 of the Refugee Convention. Accordingly, Garcia argues that, insofar as there is an ambiguity as to whether § 1158(a)(1) does carve out an exception to § 1231(a)(5), that ambiguity must be resolved in a manner that avoids the conflicts with the Refugee Protocol that he alleges would result if § 1158(a)(1) were not construed to create such an exception.

In response, the government contends only that the Refugee Protocol is not self-executing and thus that the Charming Betsy canon does not apply. But we do not find that argument persuasive. Garcia does not seek to enforce rights arising under the Refugee Protocol and, by extension, the Refugee Convention. Rather, he contends that, under the Charming Betsy canon, the existence of these rights must be used as a guide to construing the statutory provisions at issue so as to give effect to Congress's intent to honor the United States' obligations under international law. As a result, we do not see why the non-self-executing status of the Refugee Protocol bears on the Charming Betsy canon's potential application. Cf. Stevic, 467 U.S. at 425-26 (looking to the Refugee Protocol to interpret the statutory definition of the term "refugee" and noting that Congress "intended

- 32 -

that the definition would be construed consistently with the Protocol"); Cardoza-Fonseca, 480 U.S. at 432-33 (same).

Nevertheless, Garcia fails to show that the regulations create the kind of conflict with international law that the canon instructs us to avoid if possible. Accordingly, we do not see how the Charming Betsy canon helps him.

We start with Garcia's reliance on the conflict that he contends would arise in consequence of Article 34, which, as we have seen, provides that "[t]he Contracting States shall as far as possible facilitate the assimilation and naturalization of refugees." 19 U.S.T. at 6276 (emphasis added). Garcia makes no argument, however, to support his contention that this "precatory" language, Cardoza-Fonseca, 480 U.S. at 441, precludes a contracting State from imposing a limitation on the eligibility of an alien to seek asylum such as the limited one that the agency has concluded § 1231(a)(5) imposes. Thus, Garcia fails to show how Article 34 requires that we apply the Charming Betsy canon to read the relevant provisions to exclude "asylum" from § 1231(a)(5)'s bar.

We now turn to Article 28, which provides that "[t]he Contracting States shall issue to refugees lawfully staying in their territory travel documents for the purpose of travel outside their territory, unless compelling reasons of national security or public order otherwise require." 19 U.S.T. at 6274 (emphasis

- 33 -

added).  Garcia points out that aliens granted asylum may obtain a travel document permitting them to travel internationally.  By contrast, aliens granted withholding of removal may not.  Garcia thus contends that, so long as § 1231(a)(5) is read to bar aliens subject to reinstated orders of removal from seeking asylum, a conflict with the Refugee Protocol arises.  And, accordingly, he contends that the Charming Betsy canon must be deployed to avoid that conflict.

But, even though there is no dispute in this case that Garcia qualifies as a "refugee" under 8 U.S.C. § 1101(a)(42)(A), and correspondingly, under the Refugee Convention, see Cardoza-Fonseca, 480 U.S. at 436-37, the fact is that Article 28 recognizes that exceptions may be made from its requirements for "compelling reasons of national security or public order."  The governmental interest advanced by the government's reading of § 1231(a)(5) -- deterring repeated unlawful entry into this country -- would appear to constitute such a "compelling reason[] of . . . public order."  And, Garcia makes no argument to the contrary.  Thus, we have no basis for concluding that Article 28 necessitates the use of the Charming Betsy canon.[13]

---

[13] The dissent relies on a number of provisions of the Refugee Convention that Garcia never mentions.  As for the two provisions of the Convention that Garcia does address, the dissent does not address the fact that Garcia makes no developed argument regarding the exceptions they contain.  Thus, the dissent does not address the fact that Garcia offers no argument as to why the government's

- 34 -

## IV.

For the foregoing reasons, the petitions are **<u>denied.</u>**


**-Dissenting Opinion Follows-**

---

evident interest in deterring unlawful entry must be understood to conflict with Article 28, notwithstanding its "public order" exception, or Article 34, notwithstanding its "as far as possible" limitation.  Moreover, in following our usual rules of waiver and, accordingly, holding Garcia to the arguments that he actually does develop, <u>see</u> <u>Ahmed</u> v. <u>Holder</u>, 611 F.3d 90, 98 (1st Cir. 2010) ("[A]ppellate arguments advanced in a perfunctory manner, unaccompanied by citations to relevant authority, are deemed waived."), we do not impermissibly relieve the government of any burden of explanation that the <u>Charming Betsy</u> canon may impose. We simply ensure that we do not decide the case based on arguments about the meaning of international law that were never subjected to adversary testing.

**STAHL**, <u>Circuit Judge</u>, **dissenting.** In 2007, Victor Garcia Garcia, a member of Guatemala's indigenous Maya community, was scooped up in a large raid on a factory in New Bedford, Massachusetts, whisked away to a border detention center in Texas several days later, and, following a group hearing before an Immigration Judge, ordered removed from the United States. During these proceedings, Garcia did not have access to an attorney, nor was an interpreter made available to him (an interpreter would have certainly come in handy because the group hearing was conducted in Spanish, a language that Garcia does not understand). Returned to the same life of persecution in Guatemala that had led him to seek refuge here in the first place, Garcia reentered the United States and sought asylum.

Today, the majority holds that Garcia cannot apply for asylum, despite having made the higher threshold showing of likely harm that is required for an alien to acquire a temporary grant of withholding of removal. This is so, the majority postulates, because the Attorney General has ordained it as such through his own preferred statutory interpretation under <u>Chevron</u>, construing the reinstatement statute of the INA, 8 U.S.C. § 1231(a)(5), which states that an alien subject to a reinstated order of removal "is not eligible and may not apply for any relief," as trumping the broad grant of asylum in 8 U.S.C. § 1158(a)(1), which provides that "[a]ny alien who is physically present in the United States

or who arrives in the United States . . . irrespective of such alien's status, may apply for asylum in accordance with this section."  Because administrative law, like baseball, has its own default rule in cases like this -- tie goes to the agency -- in my view the majority mechanically applies that default rule, ignoring the fact that Garcia was denied due process in his initial removal proceedings and failing to address the degree to which the agency's interpretation violates the spirit, if not the letter, of various U.S. treaty obligations.

Because the majority's interpretation would put the United States in violation of international law, and countenance the flagrant due process violations that occurred below, I would find this interpretation of the relevant ambiguous provisions of the INA unreasonable under the Charming Betsy doctrine, which counsels that "an Act of Congress ought never to be construed to violate the law of nations if any other possible construction remains."  Murray v. Schooner Charming Betsy, 6 U.S. (2 Cranch) 64, 118 (1804).  Since it is beyond doubt that courts play a crucial role in ensuring that the United States complies with its treaty obligations, barring some clear indicia of Congressional intent to violate a treaty via statute, and because the majority's approach contravenes our obligations under international law and the due process protections that litigants like Garcia should rightly expect from our court system, I respectfully dissent.

## I. Facts & Background

Because the majority glosses over (or ignores completely) significant portions of the factual record, including facts that bear directly on Garcia's Charming Betsy argument, I set forth below the salient facts before explaining why I believe the legal result that the majority reaches is incorrect.

### A. Garcia's Background in Guatemala

Garcia is a member of Guatemala's indigenous Mayan community, and grew up speaking an indigenous language, K'iche. The Maya have often suffered at the hands of the ruling elite, made up primarily of the mixed-race Ladino community. During the Guatemalan Civil War, the national army and local Ladino citizen-patrols, paramilitary organizations which operated with impunity, conducted a systematic military campaign against the Maya. The Historical Clarification Commission, established by the 1996 Peace Accords, found that racial and ethnic animus constituted the reason for these attacks and atrocities, and that the Guatemalan State had "committed acts of genocide against groups of Mayan people" in four regions, including Garcia's home region of Zacualpa, Quiche. See Historical Clarification Report, Conclusions ¶¶ 110, 122.

Against that historical backdrop, Garcia put forth the following factual allegations. As a child, Garcia and his family were frequently forced to flee into the mountains when the army conducted sweeps of his village -- sweeps that often resulted in

summary executions and beatings for those unable to escape. Garcia resisted the Ladinos' efforts to draft him into their patrols, and endured at least one beating at the hands of the militia, who insulted him with racial epithets.

Far from being simply caught up in the widespread violence and unrest plaguing the country at the time, the record indicates that Garcia's family was the subject of particular ill-treatment because they were leaders in the indigenous community and in the local Catholic Church, and because following the conclusion of the Civil War, they began a long campaign to seek justice for Garcia's father and other indigenous civilians that were disappeared or were executed during the war. Ladino armed groups retaliated against Garcia, on one occasion beating him and attacking him with a knife. After this incident, Garcia was unable to walk for 15 days.

As the threats against him worsened, Garcia, fearing for his life, fled Guatemala in early 2004, hoping to join one of his brothers who was then living in New Bedford. There, Garcia lived in an underground community of other Mayans who had fled Guatemala, joined a prayer group at a local Catholic church, and became active in a local indigenous organization. He never applied for asylum in the United States during that period of time, and counsel for Garcia suggests that this was because he remained traumatized from

the events in Guatemala and spoke only minimal Spanish and no English.[14]

### B. Initial Removal Proceedings

Immigration authorities detained Garcia in March 2007 during a raid on the factory in New Bedford, Massachusetts, at which Garcia had been clandestinely employed.  After two days at a temporary holding facility, and without the opportunity to consult with an attorney, Garcia was transferred to a detention facility in southern Texas.  On March 21, 2007, in a group hearing before a Texas Immigration Court with proceedings conducted in Spanish, Garcia accepted a removal order entered against him and did not reserve his right to appeal.  Although the record is less than clear on this point, it appears that Garcia neither had access

---

[14] The record is replete with evidence that Garcia could not comprehend legal proceedings in Spanish.  On his application for asylum in 2015, on the section of the form which asked what languages the applicant speaks, Garcia wrote "Spanish (not fluently)."  At his hearing before an asylum officer in May 2015, a proceeding designed to determine whether he had a reasonable fear of being removed to Guatemala, officials instructed Garcia to give his answers in K'iche and provided him with an interpreter. The government also provided Garcia with a K'iche interpreter during the proceedings before the Boston Immigration Judge for withholding of removal.  One wonders what the Government learned between 2007 and 2015 which led it to conclude, in the latter instance, that Garcia required a K'iche interpreter so as to have the benefit of due process.

to an attorney during this proceeding, nor was there a K'iche interpreter available.

However, shortly after this hearing in 2007, a group of attorneys traveled to Texas with the assistance of a K'iche-speaking interpreter and met with Garcia and other detainees. Following this meeting, the attorneys, on Garcia's behalf, sought to reopen the appeal, arguing that his waiver of his right to apply for asylum and his right of appeal were coercive because he was denied his due process rights during the course of the initial proceedings, including the right to an attorney. In an opinion dated August 10, 2007, the BIA rejected Garcia's argument, finding that "[t]he Immigration Judge explained to the respondent, along with others at the group hearing, his rights in Spanish, including the right to appeal any adverse decision. The Immigration Judge also explained that the respondent had a right to counsel at that hearing." Garcia filed a motion to reconsider the BIA's decision, which was denied. At no point during these various appeals did the BIA address the fact that Garcia did not speak Spanish. Garcia was then removed to Guatemala.

C. The Majority's Approach

The majority opinion alludes to these procedural defects in the underlying removal proceedings, but gives them short shrift:

> Three years later, in 2007, immigration authorities in the United States apprehended Garcia, detained him, and then ordered him

- 41 -

removed from this country. From all that the record reveals, it appears that Garcia would have been successful in obtaining asylum had he sought it at that time. And, it appears, too, he may have been entitled to withholding of removal. But, he did not request either asylum or withholding of removal, apparently because of the language barriers he faced and because he was uncounseled. See ante at 12.

The majority in this passage concedes that Garcia would have likely been "successful in obtaining asylum" at the time of his initial removal proceedings, but did not have an opportunity to do so because he did not have access to a lawyer and because he did not speak the language in which the proceedings were conducted. We can surmise, as his counsel argued before the Immigration Judge in the 2015 proceedings, that Garcia had no idea what was going on at this en masse hearing at the border detention center.[15] By the time the attorneys arrived in Texas to meet with Garcia and other similarly situated indigenous persons, it was too late, because he had already been ordered removed and waived his right to appeal.

---

[15] Garcia himself confirmed as much at his 2015 reasonable fear hearing before an asylum officer (this time with the benefit of a K'iche interpreter):

Q: Have you ever been denied anything or any rights because you are Mayan?

A: Yes a lot of things have been denied for me since I don't speak Spanish and I didn't go to school.

Q: What have you been denied since you don't speak Spanish?

A: I don't understand when people talk to me so I just remain quiet because I don't understand.

Garcia would later contend that he never had a meaningful opportunity to apply for asylum during these proceedings, but to no avail. The BIA ruling in 2015 disposed of this argument in a single sentence, concluding that "[t]hough the applicant asserts he was not accorded due process in the course of his prior removal proceedings, the Immigration Judge and this Board do not have authority to review those proceedings." The majority opinion of this panel, despite, in my view, having such authority to review the underlying removal order -- a topic to which I will turn shortly -- devotes only the aforementioned four sentences to the obvious due process defects in Garcia's underlying removal order.

### D. Return to Guatemala and Subsequent Reentry

Things did not improve for Garcia after he returned to Guatemala. Ladino gangs frequently harassed Garcia, on at least one occasion shooting at him while he rode his bicycle, forcing him to flee into the woods. Once again, his efforts to organize the indigenous community through leadership in his local church were not met with enthusiasm on the part of the Ladino gang leaders, many of whom directly retaliated against Garcia's family. The frequency of harassment by the militia groups increased until, on February 10, 2015, Garcia and his son decided to flee Guatemala and join family members who had previously been granted asylum and resided in New Bedford. Garcia's wife and seven children remain

- 43 -

in Guatemala, and have informed Garcia that it is not safe to return.

### E. Administrative Proceedings Below

DHS apprehended Garcia at the border, and subsequently allowed him to travel to Massachusetts. After receiving notice that his previous removal order would be reinstated, Garcia was given a reasonable fear interview by an asylum officer on May 19, 2015, which was conducted with the assistance of a K'iche-speaking interpreter. The asylum officer found that Garcia had a reasonable fear of persecution if he were returned to Guatemala, and allowed him to apply for withholding of removal. At his hearing before the Boston Immigration Court, again with the assistance of an interpreter, Garcia argued that in addition to applying for withholding of removal, he should be permitted to apply for asylum, and that the automatic reinstatement of his prior removal order would violate U.S. obligations under the 1967 Refugee Protocol.[16]

The IJ found Garcia to be a credible witness and ruled that he had established past persecution as well as a likelihood of future persecution. He therefore granted Garcia's application

---

[16] Protocol Relating to the Status of Refugees, 19 U.S.T. 6223 (Nov. 6, 1968). Because accession to the Protocol required that the United States comply with all substantive aspects of the 1951 United Nations Convention Relating to the Status of Refugees, 189 U.N.T.S. 150 (July 28, 1951), I will refer to the "Refugee Convention" or the "Convention" when describing U.S. international law obligations under this treaty regime.

- 44 -

for withholding of removal. However, the IJ did not consider Garcia's asylum claim, concluding (as the majority does) that he was ineligible to apply for asylum under the INA because of the previous removal order. Additionally, the IJ rejected (with no accompanying analysis) Garcia's argument that a reading of the statutory language to bar asylum claims would be in tension with the Refugee Protocol. In that same opinion, the IJ rejected Garcia's argument that he had not previously been afforded a meaningful opportunity to apply for asylum, citing the 2007 BIA decision which had found that the Garcia had his "rights [explained in] Spanish."

Garcia appealed to the BIA. In a two-page order, the BIA denied Garcia's appeal, and concluded that "[n]either section 241(a)(5) of the Act nor its implementing regulations authorize the applicant to be considered for asylum." Although Garcia renewed his argument to the BIA that he had not previously had the opportunity to apply for asylum because of the procedural defects of his 2007 removal proceedings, the BIA concluded that it lacked "authority to review those proceedings."

## F. Garcia's Current Status

Thus began Garcia's sojourn through the legal limbo that the majority, today, suggests is the very position where Congress would want him. Having been granted withholding of removal, Garcia's only security is that he cannot be sent back to Guatemala.

His actual position, however, is more precarious. A grant of withholding of removal does not prevent his transfer to a third country. See 8 C.F.R. § 1208.16(f). He therefore lives under a cloud of possible relocation, and should the government decide to effect such a transfer, he would have no say in the matter. Additionally, while aliens granted withholding of removal are eligible to apply for work permits, these employment authorization documents are granted at the discretion of USCIS and are granted in increments. See 8 C.F.R. § 274a.12(a)(10). Such aliens must reapply for this document before it expires, often encountering long processing delays, and cannot work legally unless and until the authorization document is renewed.[17] Id. Furthermore, individuals in withholding of removal status are not eligible for travel documents necessary for reentry into the United States after

---

[17] By contrast, for aliens granted asylum, the regulations stipulate that "[a]n expiration date on the employment authorization document issued by USCIS reflects only that the document must be renewed, and not that the bearer's work authorization has expired." See 8 C.F.R. § 274a.12(a)(5). Additionally, asylees are exempt from the classes of aliens who "must apply" to USCIS for a work permit, id. § 274a.12(a), with the regulations obliquely noting that asylees may be employed by virtue of "an employment authorization document, issued by USCIS to the alien," with no requirement that they apply for this document, id. § 274a.12(a)(5). While it is not clear whether the issuance of the work permit to asylees is therefore obligatory on the part of USCIS, at minimum it seems obvious that aliens in withholding of removal encounter additional procedural hurdles in order to work legally.

foreign travel, while aliens who have been granted asylum or refugee status may obtain such documents.[18]

Adding insult to injury, withholding of removal carries with it no options for bringing family members to the United States, while an alien granted asylum can apply for derivative asylum status for his spouse and minor children. See Burbiene v. Holder, 568 F.3d 251, 256 n.5 (1st Cir. 2009) (noting that "there can be no derivative beneficiaries of a grant of withholding of removal"). Indeed, DHS regulations require that an alien who has been denied asylum status, but granted withholding of removal, must have his or her asylum application reconsidered. See 8 C.F.R. § 1208.16(e) ("In the event that an applicant is denied asylum solely in the exercise of discretion, and the applicant is subsequently granted withholding of deportation or removal under this section, thereby effectively precluding admission of the applicant's spouse or minor children following to join him or her, the denial of asylum shall be reconsidered.")

---

[18] See generally USCIS Form I-131, Application for Travel Document Instructions 1 (rev. Dec. 13, 2016), available at http://www.uscis.gov/files/form/i-131instr.pdf (noting that a "Reentry Permit allows a lawful permanent resident or conditional permanent resident to apply for admission to the United States upon returning from abroad" and that "[a] Refugee Travel Document is issued to an individual in valid refugee or asylee status, or to a lawful permanent resident who obtained such status as a refugee or asylee in the United States."). Because aliens granted withholding of removal status technically still have a removal order entered against them, they do not have either Refugee or Asylee status and thus may not apply for the reentry permit.

Just consider that if Garcia had access to an attorney, the benefit of legal proceedings in a language he understood, or even just an interpreter, during his initial detention and removal, he could have then applied for asylum and withholding of removal concurrently. If the government had denied his application for asylum, but later granted withholding of removal, the government would be compelled to reconsider his asylum application by virtue of the fact that withholding of removal alone "preclude[s] admission of the applicant's spouse or minor children." Id. The government apparently recognizes the absurdity of denying to the alien the right to try to bring his family to the United States because he has met the higher threshold required for withholding of removal, as opposed to the lesser showing that is required for the discretionary grant of asylum.[19] Hence the requirement that the government reopen the asylum claim in that situation.

Garcia is essentially overqualified for the relief that he seeks: he falls into the "narrower class of aliens who are given a statutory right not to be deported to the country where they are in danger," but misses out on membership in the "broad class of refugees who are eligible for a discretionary grant of asylum," all because he was initially removed from the country without due

---

[19] As the majority notes, the clear-probability test for withholding of removal "is more demanding than the 'well-founded fear' test" that applies in asylum cases. Ante at 8 (citing INS v. Cardoza-Fonseca, 480 U.S. 421, 449-50 (1987)).

process.  Cardoza-Fonseca, 480 U.S. at 424.  Yet had he been afforded a modicum of process and then had his asylum application denied, the government would be obligated to reopen that asylum application if he was subsequently granted withholding of removal.

Today we are told by the majority that the Attorney General's interpretation of the INA, which produces the absurd and counterintuitive result that I have just outlined, is reasonable because it is a permissible construction of a statutory ambiguity. This is so even though a separate provision of the INA provides that "any alien who is physically present in the United States or who arrives in the United States . . . irrespective of such alien's status, may apply for asylum."  8 U.S.C. § 1158(a)(1) (emphasis added).  Even under Mark Twain's more pessimistic assessments of Congressional sagacity,[20] I cannot agree that the result the majority reaches today is one that Congress would desire.

## II. Due Process Considerations

Before proceeding to what I believe is the main flaw in the majority's reasoning, the failure to adequately consider the Charming Betsy question and the tension between the agency's interpretation in this case and U.S. treaty commitments, I want to briefly explain why a contrary holding is not necessarily

---

[20] See Mark Twain, Foster's Case, N.Y. Tribune, Mar. 10, 1873, at 5 ("To my mind Judas was nothing but a low, mean, premature Congressman.")

inconsistent with other circuits that have held in favor of the reinstatement statute in similar cases, and why I believe that we have jurisdiction to look behind the underlying removal order and to examine whether Garcia's due process rights were violated.

## A. Other Cases Interpreting This Statutory Interplay

While the majority is quite correct that other circuits that have encountered this statutory tension have sided in favor of the reinstatement bar, none of these cases, as far as I can discern, involved petitioners whose initial removal proceedings were infected with the procedural irregularities which occurred here. Furthermore, some of these courts noted the due process tensions when applying the reinstatement statute mechanically, but found them inapplicable to the cases at hand.

For instance, in Herrera-Molina v. Holder, the Second Circuit rejected the petitioner's argument that Section 241(a)(5) "deprives him of due process," while noting that "Herrera-Molina does not allege any impropriety" in the underlying removal proceedings and "does not argue that those earlier proceedings deprived him of due process." 597 F.3d 128, 139-40 (2d Cir. 2010). Because the petitioner did not raise that argument, the court did "not consider whether [it] would have jurisdiction to review legal or constitutional challenges to the validity of that underlying deportation order." Id. at 140 n.9.

In *Perez-Guzman* v. *Lynch*, the Ninth Circuit noted that the petitioner had "testified before the IJ that the Border Patrol agents never asked him whether he feared returning to Guatemala," but also concluded that "[r]ecords of a brief interview conducted during the expedited removal process, however, note Perez answered in the negative when asked whether he feared returning to Guatemala." 835 F.3d 1066, 1070-71 (9th Cir. 2016), reh'g and reh'g en banc denied (No. 13-70579, Apr. 26, 2017). There is nothing in *Perez-Guzman* that suggests the petitioner did not speak the language in which the proceedings were conducted. By contrast, Garcia has testified that he was never asked whether he feared returning to Guatemala.[21] Of course, he may have been asked in Spanish, but I struggle to see how this is much better than not being asked at all.

Furthermore, in that same case, the Ninth Circuit noted that "[t]he Attorney General's interpretation of § 1231(a)(5) may have dire humanitarian consequences for individuals in

---

[21] Immigration Judge: When you were in front of the Immigration Judge in 2007, why didn't you tell him of your fear of these Ladino gangs?

Garcia (through an interpreter): I did not tell them anything because they did not ask me any questions whether I was afraid. That's why I didn't tell them anything.

Counsel for Garcia: Your honor, for the record, they didn't understand what was going on. We went down to Texas. The Federal Judge sent us down. We talked to everybody. They didn't understand what was going on.

reinstatement who seek relief from removal . . . because they were improperly denied an opportunity to seek asylum during their earlier removal from the United States."  Perez-Guzman, 835 F.3d at 1081.  The Ninth Circuit's rejoinder to this point, that "the government has discretion to forgo reinstatement and instead place an individual in ordinary removal proceedings," id., would seem to be cold comfort to aliens who, like Garcia, are not so fortunate as to be showered with the government's magnanimity.[22]

In short, none of our sister circuits, as far as I can gather, have encountered a comparable set of facts to those undergirding Garcia's appeal at the time that they answered this same statutory riddle.  Nor did any of them address the tension between the agency's interpretation of the INA and international law, an issue of first impression in our circuit.[23]  For these reasons, I do not find these opinions persuasive.

---

[22] The recent Fifth and Eleventh Circuit cases interpreting this issue included cursory treatments of the underlying removal proceedings, which makes it difficult to discern whether the proceedings in those cases violated the basic due process protections of the petitioners in a similar fashion to Garcia. See Ramirez-Mejia v. Lynch, 794 F.3d 485, 487 (5th Cir. 2015) ("Ramirez-Mejia I")(noting only that the petitioner "was apprehended while illegally entering the United States" and "was subsequently removed from the country"); Jimenez-Morales v. U.S. Atty. Gen., 821 F.3d 1307, 1307-08 (11th Cir. 2015) (explaining that, "after having been removed to Colombia," petitioner again tried to enter the United States without authorization).

[23] In a short denial for rehearing en banc, the Fifth Circuit in Ramirez-Mejia noted in passing that "we find no treaty obligation in conflict with our holding" because Article 34 of the Refugee Convention is a "precatory" provision (citing Cardoza-

B.  The Court's Jurisdiction to Examine Underlying Removal Orders

The procedural defects in the 2007 removal proceedings are, admittedly, not front and center in the petitioner's presentation of his case.[24]  He focuses, like the majority does, on the statutory interplay between the asylum and reinstatement of removal provisions.  However, Garcia did argue below, and renews the point on appeal in his brief, that he "was never provided a real opportunity to apply for asylum" when he was initially removed

_Fonseca_, 480 U.S. at 441) and Congress left intact the right to apply for withholding of removal and protection under the Convention Against Torture (CAT) in the IIRIRA. See _Ramirez-Mejia_ v. _Lynch_, 813 F.3d 240, 241 (5th Cir. 2016) ("_Ramirez-Mejia II_"). However, the Court did not address other pertinent sections of the Refugee Protocol, nor did it address whether the availability of CAT protection and the possibility of withholding of removal are sufficient to satisfy U.S. obligations under the Protocol.

[24] I disagree with the majority's contention that because the due process issue was "not set forth as a developed argument," these concerns have "no bearing on this appeal."  _Ante_, at 16 n.6. While Federal Rule of Appellate Procedure 28(a) generally requires that parties develop arguments in some detail in their briefs or risk having them be deemed waived, see _Ahmed_ v. _Holder_, 611 F.3d 90, 98 (1st Cir. 2010), this principle is a "prudential construct that requires the exercise of discretion,"  _U.S._ v. _Miranda_, 248 F.3d 434, 443 (5th Cir. 2001), and some courts have determined that they "have discretion to consider issues not raised in the briefs, 'particularly where substantial public interests are involved.'"  _Hatley_ v. _Lockhart_, 990 F.2d 1070, 1073 (8th Cir. 1993) (quoting _Continental Ins. Cos._ v. _Ne. Pharm. & Chem. Co., Inc._, 842 F.2d 977, 984 (8th Cir.), _cert. denied_, 488 U.S. 821 (1988)). Here, Garcia's brief raises the lack of due process afforded to him in his initial removal proceedings, and even if his brief does not develop these facts into an express argument for why his preferred statutory construction is correct, I would consider that the "substantial public interests," _id._ at 1073, at stake in this dispute counsel against applying the usual waiver rule.

in 2007. Because these statements in his brief and the descriptions of his initial confinement and removal are both sufficiently detailed to put this court on notice and sufficiently shocking that such notice should be heeded, I would conclude that the issue is properly before us.[25]

To be sure, the removal statute itself provides that "[t]he prior order of removal . . . is not subject to being reopened or reviewed," 8 U.S.C. § 1231(a)(5), and some courts have interpreted this as erecting a strict bar to judicial review of such orders, see Ramirez-Mejia, 794 F.3d at 489 ("This court has jurisdiction to review the lawfulness of a reinstatement order but not the underlying removal order."); Garcia v. Mukasey, 531 F.3d 141, 150 (2d Cir. 2008) (concluding that "the reinstatement of removal statute expressly prohibits us from giving petitioner a second bite at the apple").

---

[25] While aliens in removal proceedings do not enjoy the protections of the Sixth Amendment's right to counsel, the INA itself provides this guarantee (along with other due process protections). See 8 U.S.C. § 1229 (a)(1)(E) ("The alien may be represented by counsel and the alien will be provided (i) a period of time to secure counsel . . . and (ii) a current list of counsel" provided by the Attorney General); see also Lattab v. Ashcroft, 384 F.3d 8, 18 (1st Cir. 2004) ("In general, section 240 entitles aliens to be represented by counsel, to be heard by an immigration judge, to adduce evidence, and to cross-examine adverse witnesses."). Fifth Amendment due process protections also apply in removal proceedings. See Demore v. Kim, 538 U.S. 510, 523, (2003) ("It is well established that the Fifth Amendment entitles aliens to due process of law in deportation proceedings." (quoting Reno v. Flores, 507 U.S. 292, 306 (1993))).

However, as other courts have recognized, there is more to this story. The Supreme Court has held that reading the IIRIRA to "entirely preclude review of a pure question of law by any court would give rise to substantial constitutional questions" under the Suspension Clause.[26] I.N.S. v. St. Cyr, 533 U.S. 289, 300 (2001). In light of the "longstanding rule requiring a clear statement of congressional intent to repeal habeas jurisdiction," the Supreme Court interpreted three separate provisions of the IIRIRA and concluded that they had not clearly repealed the general grant of habeas jurisdiction to federal courts. St. Cyr, 533 U.S. at 298. Other courts have recognized similar constitutional problems with a literal reading of § 1231(a)(5) that precludes all judicial review of the underlying removal action. See, e.g., Ramirez-Molina v. Ziglar, 436 F.3d 508, 513 (5th Cir. 2006) ("[I]f there were no judicial review available to an alien in the initial removal proceedings, then § 1231(a)(5)'s foreclosure of judicial review of constitutional and legal claims regarding that order after reinstatement arguably would implicate the Suspension Clause concerns articulated in St. Cyr.").

---

[26] See U.S. Const. art. 1, § 9, cl. 2 ("The Privilege of the Writ of Habeas Corpus shall not be suspended, unless when in Cases of Rebellion or Invasion the public Safety may require it.")

- 55 -

Additionally, while a separate provision of the INA precludes judicial review over some cases, § 1252(a)(2)(D) exempts constitutional issues from this restriction:

> Nothing in subparagraph (B) or (C), or in any other provision of this chapter (other than this section) which limits or eliminates judicial review, shall be construed as precluding review of constitutional claims or questions of law raised upon a petition for review filed with an appropriate court of appeals in accordance with this section." 8 U.S.C. § 1252(d); see also id. § 1252 (b)(ii) (stating that no court shall have jurisdiction over discretionary actions taken by the Attorney General and Secretary of Homeland Security "other than the granting of relief under Section 1158(a)," which governs asylum).

In Debeato v. Att'y Gen. of U.S., the Third Circuit concluded that "there is no principled reason for reading § 1252(a)(2)(D) as permitting jurisdiction to review a final removal order, yet denying jurisdiction to review a reinstatement of that very same order." 505 F.3d 231, 234-35 (3d Cir. 2007); see also Ramirez-Molina, 436 F.3d at 513–14 ("Because § 1231(a)(5) limits judicial review, § 1252(a)(2)(D) prevents its operation in cases, such as this one, in which the validity of an underlying order is questioned on constitutional or legal grounds.").

This court has previously suggested that the automatic reinstatement of a prior removal order could present serious constitutional problems. In Lattab, the petitioner had not made the required showing of prejudice arising from his underlying removal proceedings, and thus the court was without authority to

- 56 -

reach the question of the due process-related issues associated with the summary reinstatement process. Nevertheless, with one of my colleagues on this panel writing for the court, we noted:

> Although this case does not provide a vehicle for testing the merits of the constitutional claim, we do not mean to imply that the claim is insubstantial. . . . While judicial review of reinstatement orders is available in the courts of appeals, that review may not be adequate when the alien has not been given a meaningful opportunity to develop an administrative record.

Lattab, 384 F.3d at 21 n.6 (internal citations omitted).

In my view, Garcia has satisfied the requirement of showing that he was prejudiced by the due process deficiencies in his underlying removal order. Therefore, I would find that just as the reinstatement of removal statute's bar of "any relief" does not literally mean "any relief,"[27] § 1231(a)(5)'s command that the prior order of removal "is not subject to being reopened or reviewed" does not actually mean "no reopening" and "no review" because such a reading, taken to its logical destination, would violate both the Suspension Clause and 8 U.S.C. § 1252.

To conclude, I would hold that the court is permitted to review the underlying removal order for serious due process defects when properly called upon to do so. I would further hold that a

---

[27] As the majority notes, aliens with previous removal orders can apply for cancellation of removal, departure as an alternative to removal, and adjustment of status, all forms of "relief" under the INA. See ante at 16 n.6.

mechanical and categorical application of the reinstatement of removal statute (allowing it to trump the asylum statute, as the agency suggests and as the majority holds today), would render judicial vindication of such due process rights impossible. The majority's ruling thus contravenes the court's duty in cases where "a serious doubt of constitutionality is raised" to "first ascertain whether a construction of the statute is fairly possible by which [a constitutional] question may be avoided." Ashwander v. Tenn. Valley Auth., 297 U.S. 288, 348 (1936) (Brandeis, J., concurring) (quoting Crowell v. Benson, 285 U.S. 22, 62 (1932)).

## III. The Reinstatement of Removal and International Law

The due process concerns alone might be sufficient to justify a more nuanced and case-by-case inquiry into whether the reinstatement statute should trump the right to apply for asylum in a particular petitioner's case. However, these concerns, highlighted so vividly in Garcia's case, also reinforce the most jarring problem with the majority's conclusion that the reinstatement provision wins outright: such a reading would cause the United States to run afoul of international treaty commitments in an ordinary case, and even more so in cases where the alien was not afforded due process in the initial removal proceedings.

### A. The *Charming Betsy* Canon

The interpretive principle that ambiguous federal statutes are to be interpreted in conformity with international

law where feasible can be traced to a pair of Supreme Court cases, both arising out of the quasi-war with France: <u>Talbot</u> v. <u>Seeman</u>, 5 U.S. (1 Cranch) 1 (1801), and <u>Charming Betsy</u>, 6 U.S. at 64. In <u>Talbot</u>, Chief Justice Marshall's opinion for the Court observed that "the laws of the United States ought not, if it be avoidable, so to be construed as to infract the common principles and usages of nations," and thus, by the Court's construction of the statute in question, "the act of congress will never violate those principles which we believe, and which it is our duty to believe, the legislature of the United States will always hold sacred." <u>Talbot</u>, 5 U.S. at 43-44. The <u>Charming Betsy</u> case followed three years later, in which Chief Justice Marshall announced the more familiar maxim that "an act of Congress ought never to be construed to violate the law of nations if any other possible construction remains." <u>Charming Betsy</u>, 6 U.S. (2 Cranch) at 118.

This interpretive principle is now firmly established in U.S. law and has been employed by the Supreme Court and this court on a regular basis when interpreting federal statutes. <u>See, e.g.</u>, <u>Weinberger</u> v. <u>Rossi</u>, 456 U.S. 25, 32 (1982) (noting that construing federal statutes to avoid violating international law has "been a maxim of statutory construction since the decision" in <u>Charming Betsy</u>); <u>United States</u> v. <u>Lachman</u>, 387 F.3d 42, 55 (1st Cir. 2004) ("We recognize that statutory and regulatory language should be construed in consonance with international obligations when

possible."); United States v. Hensel, 699 F.2d 18, 27 (1st Cir. 1983) (Breyer, J., for the court) (describing the Charming Betsy principle as "well established"); see also Restatement (Third) of Foreign Relations Law § 114 (Am. Law. Inst. 1987) ("Where fairly possible, a United States statute is to be construed so as not to conflict with international law or with an international agreement of the United States.")[28]

It is entirely appropriate in cases of statutory ambiguity[29] to adopt a reading of the statute that does not conflict with U.S. commitments under a non-self-executing treaty, precisely because the canon is concerned with the international obligations

---

[28] As an initial matter, I agree with the majority that there should be no objection to the application of the Charming Betsy canon to this case. The government's cursory argument, that the Refugee Protocol is not a self-executing treaty and thus it is inappropriate to apply the Charming Betsy canon, is a clear misfire. Even assuming arguendo that the relevant portions of the Refugee Protocol are not self-executing, application of the Charming Betsy canon would remain unaffected. The question of whether a treaty is self-executing speaks to whether the international agreement in question can be enforced as domestic law in the courts of the United States without implementing legislation, not whether the treaty is an international obligation on the part of the country as a whole. In Medellín v. Texas, the Supreme Court recognized that even treaty provisions that do not constitute binding federal law enforceable in United States courts may still "constitute[] an international law obligation on the part of the United States." 552 U.S. 491, 504 (2008); accord Restatement (Third) § 321 ("Every international agreement in force is binding upon the parties to it and must be performed by them in good faith.").

[29] Like other interpretive canons, "[t]he Charming Betsy canon comes into play only where Congress's intent is ambiguous." United States v. Yousef, 327 F.3d 56, 92 (2d Cir. 2003).

of the country, rather than the domestic enforceability of international law. See, e.g., Ma v. Ashcroft, 257 F.3d 1095, 1114 (9th Cir. 2001) (applying the Charming Betsy canon to avoid a violation of the International Covenant on Civil and Political Rights, which had been ratified by the United States but declared by the Senate to be non-self-executing). At least one circuit has applied the Charming Betsy canon in the context of a possible conflict between the INA and the Refugee Protocol. See Khan v. Holder, 584 F.3d 773, 783 (9th Cir. 2009) ("Under Charming Betsy, we should interpret the INA in such a way as to avoid any conflict with the [Refugee] Protocol, if possible.")[30]

A treaty, ultimately, "depends for the enforcement of its provisions on the interest and the honor of the governments which are parties to it," Medellín, 552 U.S. at 505 (quoting Head Money Cases, 112 U.S. 580, 598 (1884)), and there is no reason why the judiciary, as a co-equal branch of government, should interpret a statute in such a way that would violate a treaty, absent a clear

---

[30] Although one of our sister circuits has interpreted the canon as only applying "where conformity with the law of nations is relevant to considerations of international comity," see Serra v. Lappin, 600 F.3d 1191, 1198 (9th Cir. 2010), I would note that even if we were to apply this minority rule (which we have not previously done), there are certainly significant "foreign policy implications," Weinberger, 456 U.S. at 32, to whether (and to what extent) the United States abides by its treaty commitments to provide protection to individuals fleeing religious and political persecution. One need only open a newspaper to see why this is so.

showing by Congress that it desires this result.  Applying the

Charming Betsy doctrine is therefore consistent with the

judiciary's role to "say what the law is," Marbury v. Madison, 5

U.S. (1 Cranch) 137, 178 (1803), a role that extends to

international law.  See The Paquete Habana, 175 U.S. 677, 700

(1900) ("International law is part of our law, and must be

ascertained and administered by the courts . . . of appropriate

jurisdiction.").

### B. The Refugee Convention

The Refugee Convention "was enacted largely in response

to the experience of Jewish refugees in Europe during the period

of World War II," and the "tragic consequences of the world's

indifference at that time are well known."  Sale v. Haitian Ctrs.

Council, Inc., 509 U.S. 155, 207 (1993) (Blackmun, J., dissenting).

Although the United States did not join the Convention, it acceded

to the 1967 Protocol, and in so doing, the United States "agree[d]

to comply with the substantive provisions of Articles 2 through

34" of the Refugee Convention.  Congress soon followed with the

Refugee Act of 1980, which amended the INA specifically to "bring

United States refugee law into conformance with the 1967 Protocol."

Cardoza-Fonseca, 480 U.S. at 436.  Central to State obligations

under the 1967 Protocol (and the 1951 Convention) is the

requirement that States provide "fair and efficient procedures for

the determination of refugee status."  UNHCR Exec. Comm., General

Conclusions on International Protection, No. 71 (XLIV), U.N. Doc. A/48/12/Add.1 (Oct. 8, 1993).[31]

The majority correctly notes, ante at 34, that Garcia is a refugee under both statutory and international law. The Convention defines a "refugee" as one who, "owing to well-founded fear of being persecuted for reasons of race, religion, nationality, membership of a particular social group or political opinion, is outside the country of his nationality and is unable or, owing to such fear, is unwilling to avail himself of the protection of that country." 19 U.S.T. at 6261. The INA more or less adopts this same definition, with exceptions not relevant here.[32] The Immigration Judge found that Garcia, who is clearly "outside the country of his nationality," had a well-founded fear of persecution on account of both his membership in a particular social group and because of his religious activities, and there is no way that one could read the voluminous record in this case and

---

[31] Although not binding, the views of the Office of the United Nations High Commissioner for Refugees (UNHCR) have been cited by the Supreme Court for interpretive guidance given that office's expertise and responsibilities for monitoring refugee issues. See, e.g., Negusie v. Holder, 555 U.S. 511, 536-37 (2009) (consulting the UNHCR's Handbook on Procedures and Criteria for Determining Refugee Status, "to which the Court has looked for guidance in the past"); Cardoza-Fonseca, 480 U.S. at 439 (seeking guidance in interpreting the "well founded fear" test under the Refugee Convention and Protocol from the position of UNHCR).

[32] See 8 U.S.C. § 1101(a)(42)(A).

not agree with that conclusion.[33]  None of the exceptions under Article 1 of the Convention apply to Garcia.

As explained below, in light of that status, Garcia qualifies for certain rights and protections under international law, protections which the majority's holding today denies to him. While the materials accompanying Garcia's petition rely primarily on Article 28 (the right to have a travel document) and Article 34 (the requirement that states facilitate the naturalization of refugees), for completeness' sake, I note aspects of this case and aspects of the majority opinion that seem to be in tension with other portions of the Convention as well.[34]

----

[33] In the spirit of this case, I suppose if one could not read Spanish or English and did not have the opportunity to have the record explained to them in their native tongue, they might not be able to form an opinion one way or another on this conclusion.

[34] To be clear, Garcia's actual Charming Betsy claim is that "[t]he Agency's interpretation of INA § 241(a)(5) in a way which deprives Mr. Garcia of the opportunity to have his asylum case heard, violates its obligations under the Convention and Protocol" and that the accompanying DHS regulations "are premised on an interpretation which does not comport with U.S. obligations under the Protocol and Convention and which is in violation of international law."  Articles 34 and 28 are cited as examples, but I interpret his claim to be based on U.S. commitments under these treaty regimes more generally, and he makes several arguments about the relative paucity of benefits available under withholding of removal that would otherwise be available for aliens granted asylum, all of which collectively implicate a variety of provisions under the Refugee Convention aside from Articles 28 and 34.  Given that the focus of the Charming Betsy canon is on the international law obligations of the United States as a whole, rather than the domestic enforceability of those rights, and given what I consider to be a clear incongruity between U.S. treaty obligations and the automatic reinstatement of removal process, I find these additional provisions of the Refugee Convention to be of sufficient

- 64 -

*i. Article 17*

Article 17 of the Convention requires that states "shall accord to refugees lawfully staying in their territory the most favourable treatment accorded to nationals of a foreign country in the same circumstances, as regards the right to engage in wage-earning employment." 19 U.S.T. at 6269. The travaux préparatoires to the Convention notes that, as used in Article 17, "most favourable treatment" is defined as "the best treatment which is accorded to nationals of another country by treaty or usage." See UN High Commissioner for Human Rights, The Refugee Convention, 1951: The Travaux Préparatoires Analyzed with a Commentary by Paul Weis 94 (hereinafter "Weis, Travaux"). An early draft of Article 17, provided by the Secretariat, noted that "[b]ecause of their limited resources and their status, wage-earning employment is the only type of employment to which most refugees can aspire," and the commentary to Article 17 concludes it is "one of the most important of the Convention." Id. at 97.

The article is essentially a requirement that member states grant refugees the unrestricted right to work, on par with the rights that would be extended to other aliens. Yet, as noted above, withholding of removal status requires the periodic

importance that they warrant exploration notwithstanding Garcia's failure to explicitly raise them in his brief, for the same reasons identified at supra, note 24.

refiling of work applications to USCIS, which has discretion to reject or delay the applications, and the expiration of a permit results in the inability for the alien to work legally, in contrast with asylum status, where the expiration of the permit does not deprive the asylee of the right to work. See 8 C.F.R. § 274a.12(a)(5). Additionally, asylees are exempted from the class of aliens who "must apply" to USCIS "for a document evidencing such employment authorization," while aliens in withholding of removal are not. Id. § 274a.12(a). Because state parties are obliged to extend the most favorable treatment to refugees (comparable, at minimum, to the treatment they extend to non-refugee aliens from the same country), the imposition of a more cumbersome work permit program for aliens in withholding of removal status who are seeking employment likely violates the spirit, if not the letter, of Article 17.

       *ii. Article 28*

       Article 28 of the Convention requires that "[t]he Contracting States shall issue to refugees lawfully staying in their territory travel documents for the purpose of travel outside their territory, unless compelling reasons of national security or public order otherwise require." 19 U.S.T. at 6274. This requirement arose from a recognition that "[r]efugees who do not enjoy the protection of the authorities of their country of origin do not have national passports" and "would therefore be unable to

- 66 -

leave the initial reception country if a document replacing the passport had not been established for their benefit." Weis, Travaux, at 157.

While considering several proposed drafts of Article 28, the U.K. representative noted that were a refugee not issued a travel document by the state in question, "the refugee would probably not be allowed to enter other countries, for they would hesitate to admit him for fear that they might be obliged to keep him permanently on their territory without this provision." Weis, Travaux, at 161. The U.S. representative said that while "the US had not adhered to any convention or agreement relating to travel documents for refugees" prior to these discussions, he could "assure the Committee that refugees resident in the US would ordinarily be able to leave the country and to return to it." Id. at 162 (emphasis added).

Article 28 is a categorical requirement, "a mandatory obligation on Contracting States to issue the document," see Weis, Travaux, at 194, yet an alien who has been granted withholding of removal (as opposed to asylum) is not eligible for such a travel document, which essentially renders him trapped in the United States (at least unless the government finds a third country that is willing to take him). Because these documents are unavailable for people afforded withholding of removal status, the grant of

withholding of removal to an individual that otherwise qualifies as a refugee (like Garcia) is a per se violation of the Convention.

The majority's rejoinder to this point is that the clause allowing for exceptions to this requirement when "compelling reasons of national security or public order otherwise require" allows the government to skirt this requirement because "deterring repeated unlawful entry into this country" is a "compelling reason[] of . . . public order." See ante at 34. This is a temporal non-sequitur, because the government has already made a decision that Garcia meets the "reasonable fear" requirement for withholding of removal. If concerns of "public order" dictated that Garcia be kept out of the United States, then the United States would have various grounds to refuse to grant him withholding of removal. But after deciding that Garcia poses no such threat, on what possible basis could the government argue that "public order" considerations required that he not be permitted to leave the United States for some other country?

Nor is the majority correct in its suggestion that Garcia needs to make "an argument to the contrary" for why the United States does not have a "compelling reason of . . . public order" for denying travel documents to individuals in withholding of removal. Id. That suggestion places the burden on the wrong party, because "the issue of the travel document is an obligation" imposed on the state, and applies "unless compelling reasons of

public security or public order justify a refusal." Weis, Travaux, at 194 (emphasis in original). Examples given for such "compelling" grounds in the commentaries include "cases where a refugee seeks to escape prosecution or punishment for a criminal offence or where the refugee is suspected of travelling in order to engage in criminal or espionage activities." Id. It would not, it seems to me, apply to the issuance of a travel document to an alien, like Garcia, who had already been determined to have qualified for protected status and already had a full security screening as part of the withholding of removal process.

*iii. Article 31*

Article 31 of the Convention provides that "[t]he Contracting States shall not impose penalties, on account of their illegal entry or presence, on refugees who, coming directly from a territory where their life or freedom was threatened . . . enter or are present in their territory without authorization," 19 U.S.T. at 6275. This treaty commitment is implemented in the INA by the provision, at issue in this case, which allows individuals to apply for asylum "irrespective of such alien's status," 8 U.S.C. § 1158(a)(1), because to deny asylum relief to a refugee that has flouted a country's border control or immigration laws because of the urgency with which he was required to leave his home country would be to penalize him for the very fact of being a refugee, see 8 U.S.C. § 1101(a)(42) (recognizing that refugees, by

definition, are fleeing persecution); UN Ad Hoc Committee on Refugees and Stateless Persons, Memorandum by the Secretary-General, UN Doc. E/AC.32/2, Ch. XI, Art. 24. Para. 2 (Jan. 3, 1950) ("A refugee whose departure from his country of origin is usually a flight, is rarely in a position to comply with the requirements for legal entry (possession of national passport and visa) into the country of refuge.") For this reason, the principle of non-penalization is described in UNHCR's Introductory Note to the Convention as one of the most notable "fundamental principles" which "underpin[s]" the Convention's commitment to rights protection, along with non-discrimination and non-refoulement. See Introductory Note (UNHCR) (2010), UN Convention Relating to the Status of Refugees ("This recognizes that the seeking of asylum can require refugees to breach immigration rules.").

Because of the importance of this provision, "penalties" cannot be interpreted as merely the assessment of a fine or imprisonment, but must be applied flexibly to assess whether a state party is denying the full scope of refugee protection to a particular individual on account of his or her illegal entry into the state's territory.[35] See Refugee Convention, Introductory Note

---

[35] We have previously held that detention of an alien does not violate Article 31 because that provision "was not intended to prevent a government from detaining one who attempted to enter illegally, pending a final decision as to whether to admit or exclude the person." Amanullah v. Nelson, 811 F.2d 1, 16 n.10 (1st Cir. 1987). Here, however, the Article 31 problem is not

("Prohibited penalties might include being charged with immigration or criminal offences relating to the seeking of asylum, or being arbitrarily detained purely on the basis of seeking asylum"); see also James C. Hathaway, The Rights of Refugees Under International Law 405 (2005) (stating that penalties may include "sanctions that might ordinarily be imposed for breach of the asylum state's general migration control laws"). Though not defined in the Convention, the commentary notes that "[i]t is clear from the travaux préparatoires that ['penalties'] refers to administrative or judicial convictions on account of illegal entry or presence, not to expulsion." Weis, Travaux, at 219.

Here, although the penalty imposed on Garcia is not in the form of a criminal conviction, it is, in essence, an administrative sanction on account of his earlier illegal entry -- one automatically imposed by 8 U.S.C. § 1231(a)(5) without regard to the underlying circumstances in a petitioner's case. See *Penalty*, Black's Law Dictionary (10th ed. 2014) (defining a "statutory penalty" as one that is "imposed for a statutory violation; esp., a penalty imposing automatic liability on a wrongdoer for violation of a statute's terms."). It is also worth

---

detention but the denial of certain forms of relief that would otherwise be available to aliens (the right, in this case, merely to apply for asylum), and in Garcia's case, unlike in Amanullah, the government has already made a decision not to exclude Garcia from the country.

noting that an Amendment was introduced by the Austrian delegate during the Convention negotiations which would have provided that the non-penalization provision "shall not apply, however, to a refugee against whom an expulsion or residence order has been issued under a judicial or administrative decision of the State in which he seeks asylum." Weis, Travaux, at 214. This amendment, which describes Garcia's situation in spades, was voted down overwhelmingly, see id. at 216, and the final non-penalization provision of Article 31 did not distinguish a state's obligation to a refugee based on the existence of a prior deportation or removal order against the same refugee.[36]

Case law from other signatory states and from international courts also supports a flexible interpretation of "penalties."[37] For instance, in R v. Uxbridge Magistrates Court and Another, ex parte Adimi, the U.K. High Court (Divisional Court) noted that Article 31's protections "extend[ed] not merely to those

---

[36] Indeed, the Commentary and travaux préparatoires suggest that "[i]n the case of asylum-seekers, proceedings on account of illegal entry or presence should be suspended pending examination of their request," see Weis, Travaux, at 219. In other words, states are obliged to hear the asylum claim first before forging ahead with ordinary removal or deportation "proceedings on account of illegal entry or presence." Id.

[37] When "interpreting any treaty, [t]he 'opinions of our sister signatories' . . . are 'entitled to considerable weight.'" Abbott v. Abbott, 560 U.S. 1, 16 (2010) (quoting El Al Israel Airlines, Ltd. v. Tsui Yuan Tseng, 525 U.S. 155, 176 (1999)(alterations in original)).

ultimately accorded refugee status but also to those claiming asylum in good faith," and that the non-penalization obligation had as its broad purpose "to provide immunity for genuine refugees whose quest for asylum reasonably involved them in breaching the law." [1999] EWHC (Admin) 765, [15-16] (Eng.); see also UK Soc. Sec. Comm. Dec. No. CIS/4439/98, ¶ 16 (Nov. 25, 1999) (noting that interpreting "penalties" narrowly would "put[] form above substance and would enable contracting states to evade Article 31"). In interpreting the word "penalty" as used in the International Covenant on Civil and Political Rights (ICCPR), the UN Human Rights Committee has embraced a similarly flexible approach. See Van Duzen v. Canada, UNHRC Comm. No. 50/1979, ¶ 10.2 (Apr. 7, 1982) (stating that Article 15 of the ICCPR, which prohibits the imposition of "a heavier penalty . . . than the one that was applicable at the time when the criminal offence was committed," should be interpreted according to the "object and purpose" of the treaty as a whole).

In short, because the majority's approach categorically prevents an alien in Garcia's situation from applying for relief that would be available to other aliens, I would consider this administrative roadblock to constitute an impermissible "penalty" that is imposed on Garcia, likely triggering a violation of Article 31 because the penalty is imposed before Garcia's status as a refugee can be determined. See Hathaway at 407 (noting that it is

"lawful for a government to charge an asylum-seeker with an immigration offense, and even to commence a prosecution, so long as no conviction is entered until and unless a determination is made that the individual is not in fact a Convention refugee.") Viewing this administrative ruling as a penalty makes particular sense in a case like Garcia's, where the Attorney General's practices in the first instance of illegal entry have "deprive[d] the asylum seeker of the right to gain effective access to the procedure for determining refugee status." Amuur v. France, Eur. Ct. H.R., App. No. 19776/92, ¶ 43 (1996) (emphasis added).

    *iv. Article 34*

    Taken together, the above violations lend credence to Garcia's argument that the government's position likely violates Article 34 of the Convention. That provision, as noted in the majority opinion, provides that "[t]he Contracting States shall as far as possible facilitate the assimilation and naturalization of refugees." 19 U.S.T. at 6276 (emphasis added). While "precatory," Cardoza-Fonseca, 480 U.S. at 441, and non-self-executing, Stevic, 467 U.S. at 428, I have serious doubts as to whether the bifurcated system of withholding of removal and asylum comports with the basic spirit of Article 34, particularly when an alien's initial removal order was bereft of basic fairness and process.

    There is one final way in which a reading of the statute that only allows for withholding of removal to a petitioner like

- 74 -

Garcia is in serious tension with Article 34's commitment to facilitate the assimilation and naturalization of eligible refugees, and also with Article 31's prohibition on "penalizing" refugees. As both the majority opinion and Section I.F of this dissent point out, an alien must meet a much higher evidentiary showing to qualify for withholding of removal.

Aliens with previous removal orders, therefore, have to meet a higher burden to get less relief, even when they never had a meaningful opportunity to meet the lesser burden and receive the right to apply for more relief. I question how this could possibly be consistent with the object and purpose of Articles 31, 34, and the Convention as a whole. Ultimately, even though Article 34 "is in the form of a recommendation," Weis, Travaux, at 251, it seems very doubtful to me whether this is a recommendation that we as a country are following in good faith.

C. The ICCPR

Although the petitioner does not raise this issue, I want to note one final Charming Betsy problem: the approach adopted by the majority today leaves in place a structure, evidenced by Garcia's situation, which deprives aliens on U.S. soil of the fair trial guarantees enshrined in the International Covenant on Civil and Political Rights, 999 U.N.T.S. 171. The ICCPR was signed by the United States in 1976 and ratified thereafter by the Senate in 1992. Similar to the Refugee Protocol, the ICCPR was ratified "on

the express understanding that it was not self-executing and so did not itself create obligations enforceable in the federal courts." Sosa v. Alvarez-Machain, 542 U.S. 692, 735 (2004).

Notwithstanding its non-self-executing status, the Supreme Court and lower federal courts have frequently consulted the ICCPR as an interpretive tool to determine important issues in the area of human rights law. See, e.g., Roper v. Simmons, 543 U.S. 551, 576 (2005) (referring to the ICCPR to support the prohibition on the juvenile death penalty); Ma, 257 F.3d at 1114 (relying on Article 9 of the ICCPR, which prohibits arbitrary arrest or detention, when interpreting a provision of the INA); Igartúa-De La Rosa v. United States, 386 F.3d 313, 319 (1st Cir. 2004) (Torruella, J., dissenting), reh'g granted, judgment vacated, 404 F.3d 1 (1st Cir. 2005) (stating that, despite its non-self-executing status, "I am nonetheless compelled to recognize that the United States is in violation of its obligation under Article 25 to afford universal suffrage to its citizens" with respect to voting rights of residents of Puerto Rico).

The ICCPR applies to "all individuals within [a State's] territory and subject to its jurisdiction," ICCPR art. 2, ¶ 1, a category which includes aliens. Most pertinent to this case, Article 14 of the ICCPR lays out the basic protections for the

right to a fair trial.[38]  Among these basic rights are: "[t]o be informed promptly and in detail in a language which he understands of the nature and cause of the charge against him," Art. 14(3)(a); "[t]o have adequate time and facilities for the preparation of his defence and to communicate with counsel of his own choosing," Art. 14(3)(b); "to be informed, if he does not have legal assistance, of this right; and to have legal assistance assigned to him, in any case where the interests of justice so require," Art. 14(3)(d); and "[t]o have the free assistance of an interpreter if he cannot understand or speak the language used in court," Art. 14(3)(f).

As I have emphasized throughout this dissent, none of these rights, which are also protected under U.S. law and broadly apply to aliens in removal proceedings, were extended to Garcia during his initial removal proceedings.  True, the government has apparently remedied these violations in the instant case: Garcia is counseled and had access to an interpreter during the 2015 proceedings.  However, the government's interpretation of the INA is essentially a "one strike and you're out" policy, so it does no good for Garcia to have access to these basic due process protections now, when he has already been hoodwinked by the

---

[38] The Refugee Convention, too, provides that all refugees "shall have free access to the courts of law on the territory of all contracting states," Refugee Convention, Art. 16, a right that "applies to all refugees wherever resident and whether the residence is lawful or not." Weis, Travaux, at 97.

Potemkin process that infected his initial encounter with our justice system. It would presumably come as no surprise to Garcia to learn that a Government Accountability Office Report conducted the year after his initial removal concluded that "having [legal] representation was associated with more than a three-fold increase in the asylum grant rate compared to those without representation." See U.S. Gov't Accountability Office, GAO-08-940, U.S. Asylum System: Significant Variation Existed in Asylum Outcomes Across Immigration Courts and Judges 30 (2008). It would also do no good for him to learn this after the fact.

Because none of the basic elements of due process were met in Garcia's initial removal proceedings, and because the approach taken by the majority today leaves in place a deferential legal scaffolding that allows such tainted procedures to go unchecked, I would also find that deference to the agency on this statutory question causes the United States to be in violation of its commitments under the ICCPR's fair trial provisions.

## IV. Conclusion

There is much to be said for the majority's observation that "[i]mmigration law is distinguished by its complexity more than by its clarity." Ante at 4. In the face of such complexity, it can be tempting to throw up our hands and say that while these immigration cases are sad (and they often are), we will simply defer to the immigration authorities' reasoned judgment as to its

statutory mandate, never mind the consequences and never mind the volume of due process and international law principles that are trampled along the way.

This sort of judicial muscle memory may be the easy answer, but it is not always the correct one. Because the petitioner in this case was not afforded due process in his underlying removal proceedings, and because we are obliged to interpret statutes in consonance with international treaty obligations where fairly possible, we need not defer to an agency interpretation which violates these obligations.

I therefore dissent.